Kathleen M. GORMAN

v.

Daniel W. GORMAN.

No. 2003–611–Appeal.

Supreme Court of Rhode Island.

Aug. 26, 2005.

Paul P. Pederzani III, Warwick, for Plaintiff.

Joseph E. Rothemich, Coventry, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

# O P I N I O N

## Introduction

**Robinson, Justice.** The parties to this appeal are former spouses, and the issue before us involves the Property Settlement Agreement that was drafted in connection with their divorce. The dispute centers around two separate stock plans in which the defendant husband was at all relevant times a participant by virtue of his status as an employee of a company called "NY-PRO, Inc." In addressing the contentions of the parties, it will be necessary for us to consider some fundamental principles of contract law as they relate to the responsibilities and powers of the justices of the Family Court; and, in the end, our disposition of this appeal reflects our awareness of the peculiar status of contractual property settlement agreements that are submitted for the review and approval of the Family Court.

## Facts/Travel

The plaintiff, Kathleen M. Gorman, and the defendant, Daniel W. Gorman, were married on July 17, 1965, and they remained married for more than thirty-five years. The parties separated on or about January 3, 2002; and on February 12, 2002 plaintiff filed for divorce, stating that irreconcilable differences had led to the irremediable breakdown of their marriage. The defendant filed a counterclaim. Both parties were at all pertinent times represented by counsel.

A hearing was held before the Family Court on January 24, 2003, at which time the court heard testimony relative to both the complaint and the counterclaim. At the close of that hearing, the attorneys for the parties advised the court of their desire to memorialize in written form their agreement about the division of property. The court reserved decision and instructed the parties to submit a written agreement to the court.

Two weeks later, on February 7, 2003, the Family Court granted plaintiff's complaint and defendant's counterclaim, and it granted the parties an absolute divorce on the statutory grounds of irreconcilable differences. On the same date, the Family Court also approved the written Property Settlement Agreement that had been submitted to the court by counsel for the parties.

The most pertinent provision of that Property Settlement Agreement is the following: [1]

"11. *RETIREMENT, PENSION AND PROFIT–SHARING PLANS:*

11.1 The NYPRO ESOP Employee Stock Option Plan * * * shall * * * be divided equally between the parties via a Qualified Domestic Relations Order (QDRO)." [2]

---

1. It should also be noted at this juncture that paragraph 18.1 of the Agreement provides in pertinent part that "[t]he HUSBAND shall pay to the WIFE the sum of $750.00 per week as alimony until he reaches the age of 65."

2. Pursuant to the Retirement Equity Act of 1984, Pub. L. 98–397 § 104, 98 Stat. 1426, 1433 (codified at 29 U.S.C. § 1056(d)), a judicial order may require the division and distribution of plan benefits to a divorced spouse if the order satisfies the statutory requirements for a qualified domestic relations order (QDRO), which is defined in part as "any judgment, decree, or order (including approval of a property settlement agreement) which * * * is made pursuant to a State domestic

On April 15, 2003 (*i.e.*, more than two months after the divorce had been granted and the Property Settlement Agreement had been approved), plaintiff filed a motion seeking "clarification" of both the Property Settlement Agreement and the "intent" of the parties with respect to the Property Settlement Agreement. The defendant objected.

Subsequently, on May 2, 2003, plaintiff filed a motion for relief under Rule 60(b) of the Family Court Rules of Procedure for Domestic Relations and a motion to modify the Property Settlement Agreement. The defendant also objected to both of these motions.

In the above-referenced motions, plaintiff asserted that, in addition to being a participant in the NYPRO employee *stock option plan* ("NYPRO ESOP") which was specifically mentioned in paragraph 11.1 of the Agreement, defendant was also a participant in a NYPRO *stock bonus plan* ("NYPRO SBP").[3]

The plaintiff then argued that the parties had intended that the NYPRO SBP would be divided equally between the parties even though it was not expressly mentioned in paragraph 11 of the Agreement. This contention was based on what plaintiff alleged was her understanding that the divorcing parties had agreed upon a "fifty-fifty" division of *all* of defendant's corporate stock holdings.

The plaintiff's Rule 60(b) motion additionally asserted that the Property Settlement Agreement as executed by the parties "contains terms that were based on or mistake of fact(s), inadvertence, misrepresentation(s) and/or fraud, as it relates to the disclosure and nature of certain assets held by the Defendant through his employer, Nypro, Inc."

In his objections to these motions, defendant argued that the Agreement should be read literally and that the specific mention of the NYPRO ESOP in paragraph 11 implicitly excludes all non-specified plans from being treated as part of the Agreement.

The Family Court conducted a hearing on July 15, 2003 to resolve the dispute relative to paragraph 11 of the Agreement.

On August 20, 2003, the Family Court issued a bench decision about this matter. It found that there was an ambiguity in the Agreement with respect to the term "NYPRO ESOP Employee Stock Option Plan." In so ruling, the Family Court stated that "paragraph 11 of the agreement is subject to different constructions, and [the Family Court] must clarify the subject factual ambiguity regarding the intentions of the parties."

In reaching that conclusion, the Family Court justice took into consideration all of the negotiations between the parties as

---

relations law [in satisfaction of family support obligations]." 29 U.S.C. § 1056(d)(3)(B)(ii).

**3.** According to plaintiff's "Motion for Clarification," plaintiff's counsel learned about the existence of two distinct stock plans when he attempted to present a QDRO to defendant's employer, NYPRO, Inc.

Although the exact value of the stock bonus plan is not entirely clear from the record, defendant indicated in his brief that plaintiff's share with adjustments would have been approximately $443,700 as of November 1, 2002. At no time prior to the granting of the

divorce was the significance of this asset brought to the attention of the Family Court justice. At the hearing on January 24, 2003, plaintiff testified that it was her understanding that the "Nypro stock" would be divided equally by means of a QDRO whereas defendant indicated that they were "going to QDRO" the "Employee Stock Option Plan." At the February 7, 2003 hearing, when property agreement was approved in open court, neither party specifically mentioned the NYPRO stock plans.

well as the testimony of the parties at the hearings on January 24 and July 15, 2003. He found that plaintiff and defendant had intended that *all* of defendant's NYPRO stock (including the NYPRO SBP stock) would be divided equally between the parties; and he further found that the parties were actually referring to *all* of defendant's NYPRO stock when they used the term "NYPRO ESOP" in paragraph 11 of the Agreement. Specifically, the court stated:

> "[T]hroughout the discovery process, defendant represented that the total number of stock holdings were either held in the, quote, Employer Stock Option Plan, close quotes, or generally held as NYPRO stock * * *. Never at any time did the defendant specifically alert plaintiff to the fact he held considerable stock in his employee stock bonus plan.

> "Therefore, the plaintiff would have had no reason to believe that by simply drafting paragraph 11 to read, quote, Employee Stock Option Plan, close quote, she was foregoing a substantial portion of the NYPRO stock."

The Family Court found that it was clear from the transcript of the January 24, 2003 hearing both that plaintiff did not know that defendant held the NYPRO SBP and that the divorcing parties "intended all NYPRO stock to be distributed under the title, quote, Employee Stock Option Plan, close quote." The court further found that, at the July 15, 2003 hearing on the Motion for Clarification, plaintiff repeatedly testified that she believed that all of

defendant's NYPRO stocks were held within the NYPRO ESOP.

The court found it "noteworthy" that, even though defendant was in the best position to distinguish the two stock plans, he nonetheless had allowed "the subject ambiguity to go unnoticed despite numerous opportunities to rectify the situation." The court stated that it would be improper to reward defendant where he should have been aware of the misunderstanding and should have taken steps to clarify the matter. For these reasons, the court held that paragraph 11 of the Property Settlement Agreement should be construed as dividing equally *all* of defendant's NYPRO stock, including both the NYPRO ESOP and the NYPRO SBP.

In accordance with the foregoing findings, on September 26, 2003, the Family Court entered an order directing defendant to transfer to plaintiff one-half of *all* the stock that he held by virtue of his employment with NYPRO, Inc., as of the date of execution of the Property Settlement Agreement.[4] A decision pending entry of final judgment was issued on that same date. This appeal followed the entry of final judgment.

### Analysis

#### 1. The Family Court's Finding of Ambiguity

On appeal, defendant argues that the Agreement is unambiguous because it specifically references "the NYPRO ESOP Employee Stock Option Plan" and makes absolutely no mention of the separate and distinct NYPRO Stock Bonus Plan.[5]

---

**4.** The Family Court also ordered that, if defendant were to be precluded from transferring the stocks necessary to provide plaintiff with her one-half interest, he must in that case transfer to plaintiff such other assets he held as would equal that one-half interest.

**5.** The defendant contends that the distinction between the two plans was made known to

plaintiff before the agreement was signed. Specifically, defendant asserts that, during negotiations with plaintiff during October and November 2002, he alerted plaintiff that his NYPRO SBP could not be QDRO'd because it is not subject to ERISA. The defendant further says that, in spite of that apparent obstacle, he had received permission from his em-

■ The Family Court has broad power to review and to decide whether to approve proposed property settlement agreements, given the special status that the law accords to agreements between spouses. *See Lecours v. Lecours,* 792 A.2d 730, 731 (R.I.2002); *Bowen v. Bowen,* 675 A.2d 412, 414 (R.I.1996).

■ The highly respected justice of the Family Court who presided over this case, in reconsidering the subject Agreement after one of the parties had sought "clarification," was in fact acting on the basis of his statutorily conferred right and duty to oversee divorce proceedings. That oversight responsibility includes the authority to review the division of the marital assets pursuant to a property settlement agreement.

■ In the case of *Christian v. Christian,* 42 N.Y.2d 63, 396 N.Y.S.2d 817, 365 N.E.2d 849, 855 (N.Y.1977), New York's highest court succinctly summarized the special status that the law accords to contracts between spouses: "Agreements between spouses, unlike ordinary business contracts, involve a fiduciary relationship requiring the utmost of good faith." We endorse and adopt that cogent statement of a principle that should govern the dealings of spouses who invoke the Family Court's powers for the purpose of obtaining a divorce. As a result of the fundamental difference between ordinary business contracts and spousal agreements, family courts should and do monitor such agreements with special attention and with a concern for the equities of the situation.

■ When the Family Court considered the above-referenced motions that plaintiff filed several weeks after the absolute divorce had been granted, it in effect treated them as Rule 60(b) motions for relief from judgment and proceeded to take a close second look at the Property Settlement Agreement.[6]

It was at that point that the Family Court realized that the Property Settlement Agreement did not represent the "fifty-fifty" approach that the Family Court had considered to be fair in view of both the length of the marriage and the other equitable considerations present in the record. After having considered these factors and the additional testimony,[7] the

---

ployer to sell his NYPRO SBP shares and that he subsequently offered plaintiff a settlement package that would consist in part of cash to be obtained from the sale of his stock in the NYPRO SBP. The defendant also points to his deposition on November 18, 2002, during which he testified about the existence of certain NYPRO stock, that could not be QDRO'd and that his employer told him must be sold within a short period. In view of our disposition of this case, we need not reach these contentions (some of which do not appear to be based on materials that are formally part of the record).

6. Rule 60(b) of the Family Court Rules of Procedure for Domestic Relations apply in situations involving petitions for relief from a final judgment, order, or proceeding. Despite the fact that the Agreement in this case was not merged into the final divorce judgment, it is our opinion that, because the Agreement is so closely related to the divorce decree, it was appropriate for the Family Court to consider under Rule 60(b) the issues raised by plaintiff.

7. The Family Court appears to have given some weight to the testimony of the parties about what they *intended* Paragraph 11.1 of the Agreement to mean. In view of our holding about the unambiguous nature of that paragraph, however, we give no weight whatsoever to that testimony.

If the Property Settlement Agreement had been an ordinary contract, the result in this case would surely have been less satisfying for plaintiff. *See F.D. McKendall Lumber Co. v. Kalian,* 425 A.2d 515, 518 (R.I.1981) ("We note here the general rule that a party who signs an instrument manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its contents."). It is only because of the

Family Court justice determined that the Property Settlement Agreement was ambiguous on its face and also was inequitable and did not merit his continuing approval.

■ Although we fully understand the equitable concerns that motivated the Family Court justice, we must disagree with that aspect of his ruling that held the Agreement to be ambiguous.[8] We consider the Property Settlement Agreement to be an unambiguous contractual document. In particular, we find no ambiguity about the term "NYPRO ESOP Employee Stock Option Plan," which is expressly referred to in paragraph 11.1 of the Agreement. The document clearly calls for division of the NYPRO ESOP, and it makes absolutely no mention of the NYPRO SBP.[9]

■ But our holding as to the unambiguous nature of the language in the Agreement is not the end of the matter; we must now turn to the Family Court's responsibilities when contractual agreements of this type are concerned.

■ What differentiates the contractual agreement at issue in this case (*i.e.*, the Property Settlement Agreement) from most contracts is that it was not immediately self-executing, as contracts usually are. Although the opposing parties in a divorce proceeding (and their attorneys) customarily negotiate the terms of the property settlement agreement with each other, the fruit of those negotiations (even if reflected in a completed and integrated and signed document as was the case here) is subject to review and approval by the Family Court.[10] *See* G.L.1956 § 8–10–3(a)

---

special nature of agreements in the Family Court context (where judicial approval is a *sine qua non*) that we reach the result that we do in this case.

8. It is a fundamental principle of contract law that the existence of ambiguity *vel non* in a contract is an issue of law to be determined by the court. *Newport Plaza Associates, L.P. v. Durfee Attleboro Bank*, 985 F.2d 640, 644–45 (1st Cir.1993) ("Under Rhode Island law, the determination of whether a contract's terms are ambiguous is itself a question of law for the court."); *Rotelli v. Catanzaro*, 686 A.2d 91, 94 (R.I.1996) ("Whether the terms of a contract are clear and unambiguous is itself a question of law * * *."); *see also Westinghouse Broadcasting Co. v. Dial Media, Inc.*, 122 R.I. 571, 410 A.2d 986, 991 (1980); *see generally Nadherny v. Roseland Property Co.*, 390 F.3d 44, 49 (1st Cir.2004); *Alison H. v. Byard*, 163 F.3d 2, 6 (1st Cir.1998).

For that reason, the holding of a trial court (including the Family Court) about the existence or non-existence of ambiguity in the terms of the contract is freely reviewable by this Court. *Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates*, 763 A.2d 1005, 1007 (R.I.2001) ("Questions of law and statutory interpretation * * * are reviewed *de novo* by this Court.").

9. The venerable maxim of contract interpretation *expressio unius est exclusio alterius* is frequently a helpful interpretive guide in situations like the present one. *See* 5 Corbin on Contracts (*Interpretation of Contracts*) § 24.28 at 315–16 (Margaret N. Kniffin, rev. ed. 1998) ("The maxim *expressio unius est exclusio alterius* means literally 'the expression of the one is the exclusion of the other.' If the parties in their contract have specifically named one item or if they have specifically enumerated several items of a larger class, a reasonable inference is that they did not intend to include other, similar items not listed.").

Paragraph 11 of the Property Settlement Agreement enumerates the specific "Retirement, Pension, and Profit–Sharing Plans" that are to be divided between the parties. Because the Agreement specifically names the NYPRO ESOP and does not mention the NYPRO SBP, adherence to the just-quoted maxim would tend to support the inference that the parties did not intend to include the NYPRO SBP.

10. In some respects, this situation is similar to those involving parties who negotiate a tentative contract for the sale and purchase of real estate but make that tentative agreement subject to approval of a third party (often the

(specifying that the Family Court has jurisdiction over "antenuptial agreements, property settlement agreements and all other contracts between persons who at the time of execution of the contracts, were husband and wife or planned to enter into that relationship"); *see also Bowen v. Bowen,* 675 A.2d 412, 414 (R.I.1996). It is because of the special oversight duties of the Family Court with respect to property settlement agreements that we do not leave these parties to the terms to which they agreed in a formal written document.[11]

█ If this were an ordinary contractual dispute, we would simply hold the Agreement to be unambiguous and would allow its provisions to be carried out as expressed in the written document.[12] But this is not an ordinary contractual dispute. Because the Agreement was drafted in the

---

attorney for one of the contracting parties). The law is quite clear that no binding contract exists until such third-party approval is obtained. *See, e.g., Nelson v. Ring,* 136 A.D.2d 878, 524 N.Y.S.2d 544, 546 (N.Y.App.Div. 1988) (holding that an "attorney approval clause" in a contract for the sale of real estate was a part of that contract and would have to be satisfied for the underlying contract to be enforceable); *see also Davis v. Satrom,* 383 N.W.2d 831 (N.D.1986). *See generally Hein Enterprises, Ltd. v. San Francisco Real Estate Investors,* 720 P.2d 975 (Colo.Ct.App.1985); *Groshek v. Frainey,* 274 Ill.App.3d 566, 211 Ill.Dec. 5, 654 N.E.2d 467 (1995); *Smith v. Allmon,* 17 Mass.App.Ct. 712, 461 N.E.2d 1237 (1984).

11. If the agreement were bilateral in the usual sense and not subject to review and approval by a justice of the Family Court, our every instinct, as informed by fundamental principles of Anglo–American contract law, would be to leave these represented parties to their original agreement.

Under established contract law principles, when there is an unambiguous contract and no proof of duress or the like, the terms of the contract are to be applied as written. *See, e.g., Rivera v. Gagnon,* 847 A.2d 280, 284 (R.I.2004) ("If the contract terms are clear and unambiguous, judicial construction is at an end for the terms will be applied as written."); *Durfee v. Ocean State Steel, Inc.,* 636 A.2d 698, 703 (R.I.1994) ("It is a basic tenet of contract law that the contracting parties can make as 'good a deal or as bad a deal' as they see fit, limited to some extent by certain rules of enforcement.") (citing John D. Calamari and Joseph M. Perillo, *The Law of Contracts* § 1–3 at 6 (3d ed. 1987)); *see also Psaty & Fuhrman, Inc. v. Housing Authority of Providence,* 76 R.I. 87, 93, 68 A.2d 32, 36 (1949)

("The parties to a contract are free to agree upon any terms that are not illegal.").

12. This is a close and troubling case, particularly because we perceive no evidence of unethically sharp dealing on the part of defendant or his attorney. Documents accompanying the parties' briefs to this Court suggest that it was disclosed during the discovery process that through his employment with NYPRO, Inc., Mr. Gorman was a participant in two separate stock plans—one of which could be subject to a QDRO and one of which could not be. It remains quite unclear to us why the plaintiff's attorney apparently failed to explore and seek to clarify the implications of the existence of these two plans.

We would also point out that paragraph 13 of the Agreement (entitled "Other Assets") states:
"The Parties acknowledge that there has been full disclosure of all assets standing in the names of the Parties and, with the assistance of counsel and appropriate financial advisors, the Parties have investigated the nature and value of all of the marital assets. The HUSBAND and WIFE further acknowledge and agree that they have accepted the value of all of the assets as being true and accurate in an effort to resolve the litigation and settle the controversy between the Parties."
As prospective advice to Family Court practitioners, we wish to state our view that it is incumbent upon parties seeking court approval of a proposed property settlement agreement to bring the salient features of the agreement to the attention of the Family Court justice. Only when reasonably apprised of its terms, can he or she properly assess whether such an agreement is fair and equitable to both parties.

context of a divorce proceeding, the validity and enforceability of such a contractual agreement between divorcing spouses must be analyzed differently from the way in which those aspects of an ordinary bilateral contract would be analyzed. Therefore, despite our finding that no ambiguity exists in the Agreement, we conclude that the Family Court, which, upon considering the motions filed by plaintiff's attorney, saw an inequity in the terms of the Agreement, acted logically in concluding that the Agreement ought not be enforced to the extent that it was inequitable. We must next decide whether the Family Court properly modified (*i.e.*, reformed) the Agreement in its effort to remedy this perceived inequity.

## 2. The Family Court's Modification of the Agreement

The defendant argues that the Family Court was without legal authority to reform the Agreement. The defendant contends that, since a property settlement agreement which is not merged into the final decree of divorce retains the characteristics of a contract,[13] it can be modified only if both parties consent to the modification.[14] We agree with these contentions, which are based on settled law.

For a contract to be subject to judicial reformation, the court must first find a mutual mistake. *See Yates v. Hill,* 761 A.2d 677, 680 (R.I.2000) ("To permit reformation of a contract, it must appear by reason of mutual mistake that the parties' agreement fails in some material respect to reflect correctly their prior understanding."); *Hopkins v. The Equitable Life Assurance Society of the United States,* 107 R.I. 679, 685, 270 A.2d 915, 918 (1970) ("To warrant reformation it must appear that by reason of mistake, common to both parties, their agreement fails in some material respect correctly to reflect their prior completed understanding.").[15]

**13.** As the Family Court expressly indicated, the Property Settlement Agreement at issue in this case did not merge into the divorce decree, but rather was to be incorporated by reference in the decree. For this reason, the Agreement is considered to be similar to a separate and independent contract (although, as we have emphasized above, settlement agreements between spouses differ from ordinary contracts with respect to enforceability). *See Ritter v. Mantissa Investment Corp.,* 864 A.2d 601, 607 (R.I.2005) ("Since the agreement was incorporated by reference, but not merged into, the divorce judgment, it 'retains the characteristics of a contract.'") (quoting *Riffenburg v. Riffenburg,* 585 A.2d 627, 630 (R.I.1991)).

**14.** In addition, defendant argues that, even if this Court were to hold that the Agreement is ambiguous and that it could be judicially modified, the NYPRO SBP should nonetheless not be QDRO'd in this case because that would result in plaintiff's receiving a "windfall." He explains that such an approach would result in a "windfall" to plaintiff because it is undisputed that the intent of the parties was to divide the entirety of the mari-

tal assets in a roughly equal manner. The defendant asserts that, during earlier negotiations between the parties, he had offered to pay $750 per month to plaintiff in alimony; and he further asserts that that offer was precipitated by plaintiff's failure to respond to defendant's earlier lump sum offer, which would have granted plaintiff the proceeds from the sale of one-half the stock in his Bonus Plan and one half the proceeds from the sale of their real property. Therefore, defendant contends, the provision for $750 a month in alimony that is contained in paragraph 18 of the Property Settlement Agreement (*see* n. 1, *supra*) was a bargained-for substitution for the earlier proposal involving the sale of certain Bonus Plan assets. In other words, defendant contends that plaintiff deliberately chose to have her approximate one-half share of the property division satisfied by the non-SBP assets and by alimony payments. In light of our disposition in this case, however, we need not consider this argument.

**15.** *See Dubreuil v. Allstate Insurance Co.,* 511 A.2d 300, 302–03 (R.I.1986) ("A mutual mistake is one common to both parties wherein

The Family Court, which did *not* find mutual mistake in this case, is subject to that same limitation.

■ Absent the consent of the parties or one of the recognized bases for reformation, the Family Court does not have the authority to reform or modify a contractual property settlement agreement that is incorporated by reference in (but not merged into) the final divorce judgment. *See Riffenburg v. Riffenburg*, 585 A.2d 627, 630 (R.I.1991) (holding that "the judiciary is without authority to modify alimony in a nonmerged separation agreement").

We have found the Property Settlement Agreement at issue to be unambiguous, and we see no evidence of *mutual* mistake. Therefore, reformation was not a remedy that was properly available to the Family Court.

In summary, we believe that the Family Court in this case had the power to *review* the Property Settlement Agreement and to withdraw its approval of the Agreement when it determined that the Agreement was inequitable. It did not, however, have the power to reform the Agreement so as to resolve what it perceived to be the inequitable nature of some of its terms.[16] The Family Court should have either directed the parties to negotiate a new Property Settlement Agreement for review and approval by the court or simply ordered the parties to proceed to trial.

### Conclusion

In view of the fact that the Family Court found that the written document before it did not in fact reflect the "fifty-fifty" division that the justice considered to be equitable, we remand this case to that court with instructions to direct the parties to renegotiate and submit a new Property Settlement Agreement to the Family Court for its consideration. As was the right of either party prior to the execution of the Property Settlement Agreement that the court initially approved, both the plaintiff and the defendant retain the right to seek a trial if their further negotiations are unsuccessful. Having said that, we wish also to express the fervent hope that those negotiations will be successful.

each labors under a misconception respecting the same terms of the written agreement sought to be [reformed]."); *see also Vanderford v. Kettelle*, 75 R.I. 130, 139, 64 A.2d 483, 487 (1949) ("[I]t [is] necessary to establish such [mutual] mistake by clear and convincing evidence before a reformation of * * * an instrument should be granted.").

Other circumstances, such as fraud, can sometimes provide a basis for judicial reformation; but none of those circumstances are present in this case. *See* 66 Am. Jur. 2d *Reformation of Instruments* § 1 at 226–27 (2001) ("The theory of reformation requires a plaintiff to show * * * mutual mistake or mistake on part of one and fraud or inequita-

ble conduct on the part of the other, as a result of which the instrument reflects something neither party had intended * * *."); *see also* 66 Am. Jur. 2d *Reformation of Instruments* §§ 11, 20, 21, 22 (2001).

16.  The procedural posture of this case is radically dissimilar from that present in *Lecours v. Lecours*, 792 A.2d 730 (R.I.2002). In that case, the defendant failed to object to (and indeed agreed to) the Family Court's modification of the property settlement agreement about which there is dispute. *Id.* at 732. In this case, by contrast, defendant objected on the record to plaintiff's motions.