DECISION
This matter was tried to the Court without a jury. The following constitutes the Court's findings of fact and conclusions of law as required by the Rule 52 of the Superior Court Rules of Civil Procedure. The Plaintiff, American Express Corporation (Amex), is attempting to collect a past due balance on a business credit card account allegedly due from Defendant Walter Zaman (Mr. Zaman), as authorizing officer of a corporation called Northeast Mechanical. The business no longer is in operation and Amex seeks payment from Mr. Zaman personally as a joint obligor on the debt.
 I Findings of Fact
1. In July 2003, Mr. Zaman was President and Operations Manager of Northeast Mechanical, a Connecticut Corporation with its principal place of business at 6 Green Hollow Lane, Central Village, Connecticut. Mr. Zaman's residential address was 26 Almond Drive, Johnston, Rhode Island.
2. Northeast Mechanical is no longer an operating business, and the corporation has dissolved. *Page 2 
3. On or about July 2003, the company was contacted by Amex's telemarketing department concerning issuance of a platinum business card for Northeast Mechanical. After consulting with his business partner, Liz Gemma, Mr. Zaman instructed members of his staff at Northeast Mechanical to respond by applying for the American Express card. At that time, he understood his staff would request a card to be used by the business, especially with regard to telephone purchases.
4. Since Mr. Zaman did not initiate the call to Amex for purposes of obtaining the credit card, the Amex telemarketing employee requested to speak with a "person in authority at the business." Mr. Zaman responded to this request and spoke to the Amex representative on the telephone. Indeed, there is no question that Mr. Zaman was the "authorizing officer" who spoke to Amex at the time of the company's application for a credit card.
5. At the time of this telephone call, Mr. Zaman understood the card was to be a business card to be used by the business for business purposes. There is no direct evidence to establish that Zaman understood or intended that the card was to be issued to Mr. Zaman personally. Circumstantial evidence suggests that either at the time of the initial telephone conversation, or shortly thereafter, by phone or other means of communication, Mr. Zaman was requested to, and did provide Amex with his residential address, residence phone number, and personal social security number as well as personal credit information, date of birth, and telephone number.
6. The fact that Mr. Zaman was requested to provide personal information to Amex suggests inferentially that Mr. Zaman knew from the outset that the card was to be issued to him personally, as well as to the business. After the application was made, a plastic card bearing his name as well as the business name arrived at the Northeastern Mechanical business address. Accompanying the card was a "welcome-packet," so-called, which contained inter alia the terms *Page 3 
and conditions governing use and liability with respect to the Business Platinum Card. Under those terms and conditions, the agreement was governed by New York law. Said agreement was entitled "Agreement Among Business Platinum Member, Company and American Express Travel Related Services Company, Inc." However, a later amendment to the agreement, entitled "Business Platinum Card Agreement," provides that the agreement is governed by Utah law.[1] The parties do not dispute that Utah law applies as to the collection of this debt.
7. At least until he reviewed the first Amex statement and the actual plastic card, Mr. Zaman claims not to have been aware that the card was issued in both his personal name and that of Northeast Mechanical.
8. Thereafter, Amex sent monthly account statements/invoices addressed to "Walter Zaman, Northeast Mechanical" at the business address located at "6 Green Hollow Lane, Central Village, Connecticut." No invoices/statements ever were sent to Mr. Zaman at his residential address.
9. Mr. Zaman testified that he never personally received the actual plastic credit card or the terms and conditions at his home address, and Amex produced no evidence to the contrary. The record reveals that Mr. Zaman's residential address and other personal information appeared on a copy of the computer screen which Amex described as "the application." There was never a paper application signed by Mr. Zaman personally or in his capacity as an authorized representative of Northeast Mechanical.
10. The plastic card bearing the title "Business Platinum Card" was activated when someone at Northeast Mechanical telephoned Amex by calling the activation number as it *Page 4 
appeared on the card. Thereafter, the card was used by Northeast Mechanical employees, as well as Mr. Zaman, to periodically make business purchases. Thus, the card was "accepted," used, and never returned to Amex. Although the Court questioned Mr. Zaman regarding some of the credit card purchases as reflecting use of the card for personal expenses, the Court is satisfied that Mr. Zaman and Northeast Mechanical used the card exclusively for purchases made for or on behalf of the business.
11. The current outstanding balance owed on the card is $103,422.44. Mr. Zaman did not introduce any evidence disputing the amount claimed by Amex to be due and owing on the account.
12. Routinely, the clerical staff at Northeast placed the Amex invoices in the monthly run of accounts payable, and Mr. Zaman periodically signed the Northeast Mechanical checks for payment of the account. Alternatively, the accounts occasionally were paid via the internet with Northeast Mechanical funds. On various occasions, Amex referenced Mr. Zaman's personal credit scores when he inquired by telephone about increasing the credit limits on the card.
13. After Mr. Zaman left his employment at Northeast Mechanical, he received telephone calls at his personal residence from a collection agency representing Amex. The collection agency stated that he was personally liable on the account and demanded payment of unpaid balances. Mr. Zaman testified that it was not until he received these calls that he learned for the first time that Amex believed he was personally liable on this Amex account. Mr. Zaman's testimony in this respect was not credible in that Amex had all of Mr. Zaman's personal information on the account records, which information likely was provided by Mr. Zaman at or about the time the telephone application was made. *Page 5 
14. There is no evidence that Mr. Zaman actually read the terms and conditions of the "business platinum card" which provides, in typical "small type," information pertaining to "Liability for Charges."[2] The term states among other things that "The Company and Authorizing Officer are liable to us for all charges on the Card Account made in connection with all Business Cards."
15. Although Mr. Zaman never "signed" a paper application, since the account was opened by telephone, the Court does not accept as credible Mr. Zaman's testimony that he was unaware of his personal liability until he received calls from the collection agency. Rather, the Court finds from the circumstantial evidence that Mr. Zaman was or should have been aware of his personal liability as early as his initial telephone conversation with Amex or after receipt of terms and conditions at his business address. Certainly, at a minimum, Mr. Zaman was on "inquiry notice" of his personal liability when he saw the plastic card bearing his name, when he saw the monthly statements that bore his name as well as the company name, and when Amex discussed his personal credit scores when he inquired about credit limits. In addition, part of the invoice showing the details of monthly transactions contained in the heading was "New activity for Walter Zaman."
 II Standard of Review
The parties agree that the terms of the credit card are governed by Utah law.
 "Utah courts hold that [t]he underlying purpose in construing or interpreting a contract is to ascertain the intentions of the parties to the contract. In interpreting contracts, Utah courts first look at the language within the four corners of the contract [and determine whether the contract] is unambiguous. If the language is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be *Page 6 
interpreted as a matter of law." Tom Heal Commercial Real Estate, Inc. v. Overton, 116 P.3d 965, 967 (Utah App. 2005) (internal quotations and citation omitted.)[3]
 III Analysis
Under Utah law, a credit agreement generally must be signed by the cardholder in order for liability to attach for any unpaid balance thereunder. However, under Utah's statute of frauds,
 "A credit agreement is binding and enforceable without any signature if:
 (i) the debtor is provided with a written copy of the terms of the agreement (ii) the agreement provides that any use of the credit offered shall constitute acceptance of the terms; and (iii) after the debtor receives the agreement, the debtor or a person authorized by the debtor, requests funds pursuant to the credit agreement or otherwise uses the credit offered." Utah Code Ann. § 25-5-4 (2)(e) (Supp. 2005).[4]
According to the plain and unambiguous language of this provision, an unsigned credit agreement is binding and enforceable after certain requirements are met. Those requirements are: (1) the debtor is provided with the written terms of the agreement; (2) the agreement states that use of the credit constitutes acceptance; and, (3) after receipt of the agreement, the debtor *Page 7 
uses or authorizes others to request funds or use credit pursuant to the agreement. See Utah Code Ann. § 25-5-4 (2)(e); seealso MBNA Bank, N.A. v. Goodman,140 P.3d 589, 592 (Utah App. 2006) (reversing a motion to dismiss where the defendant "was provided with a copy of the Agreement, the Agreement contained a provision that acceptance of the Agreement's terms occurred through use of the credit card, and [the defendant] undisputedly used the credit account").
In this case, the Court specifically finds that Mr. Zaman was provided with a written copy of the agreement (even though not sent to his personal residence). Consequently, the first requirement of the Utah statute has been met. Next, the Court must determine whether the Amex agreement states that use of the card constitutes acceptance, and whether Mr. Zaman, in fact, used or authorized others to use the card after receiving the terms and conditions governing use of the card.
The Definition section of the agreement that Amex initially mailed to the Northeast Mechanical address provided in pertinent part: "the words `you' and `your' mean the person named on the enclosed Business Card, or, where applicable, the Company. . . ."See Agreement Among Business Platinum Member, Company and American Express Travel Related Services Company, Inc.[5] It is undisputed that Mr. Zaman is named on the platinum business card at issue; consequently, according to the agreement's terms and conditions, any reference to the words "you" and "your" in that agreement applied to Mr. Zaman.
Under the heading "Accepting the Agreement" the document provided: *Page 8 
 "If you agree to be bound by this Agreement, you should sign the Card as soon as you receive it. If you do not wish to be bound by this Agreement, cut the Card in half and return the pieces to us. Unless you do so, we will assume that you have accepted this Agreement. Any use of the Card also indicates your acceptance of everything written here. Do not use the Card before the valid date or after the expiration printed on its face." Id.
Thus, according to the clear and unambiguous language of the agreement, use of the card constituted acceptance of that agreement. Such language satisfies the second prong of the Utah statute of frauds; namely, that the agreement must state that use of the proffered credit constitutes acceptance.
At trial, Mr. Zaman testified that he had used the card and had authorized others in the company to use the card. Considering that Mr. Zaman used, and authorized other employees to use the credit card, the third requirement for enforcing the agreement against Mr. Zaman without his signature has been satisfied under Utah law. See Utah Code Ann. § 25-5-4 (2)(e) (Supp. 2005) (requiring debtor to use or authorize others to request funds or use credit pursuant to the agreement).
As the three requirements set forth in § 25-5-4 (2)(e) of the Utah Code have been met, the Court concludes that Amex has satisfied its burden of proving that Mr. Zaman accepted the terms and conditions of the agreement despite the fact that he did not sign an application for the business platinum card.[6] The next issue is whether Mr. Zaman may be held personally liable for the past due balance on the card. *Page 9 
The definition section of the terms and conditions of the agreement provides in pertinent part:
 "You have received this Business Card at the request of the Company for use in connection with the Card Account. You will be called a Business Card member. You will be liable for charges made in conjunction with the Business Card issued to you. If you are the officer who authorized us to issue one or more Business Cards by signing the Company's application for the Card Account (the "Authorizing Officer"), you agree to be bound by the terms of this Agreement as they apply to the Company.
 . . .
 The Company and any Business Card Members using the Card Account agree both jointly and individually to be bound by the terms of this Agreement."
According to the clear and unambiguous language of this provision, both Northeast Mechanical and Mr. Zaman may be held liable for the debt both jointly and individually. It is undisputed that Northeast Mechanical no longer exists as a legal entity; therefore, it cannot be held liable. Accordingly, the Court will enter judgment in favor of American Express against Defendant Zaman.
 Conclusion
In light of the foregoing, the Court concludes that Mr. Zaman is liable for the amount of $103,422.44 together with prejudgment interest at the statutory rate commencing on date of statement reflecting such balance.
Counsel shall submit an appropriate form of judgment consistent with this Decision.
[1] The original agreement provided:
 "We may change the terms of or add new terms to this Agreement at any time, in accordance with applicable law. We may apply any changed or new terms to any then-existing balances on your Account as well as to any future balances."
[2] The Court observes that it had difficulty reading the terms and conditions without the aid of magnification.
[3] Similarly, in Rhode Island, the determination of "[w]hether a particular contract is or is not ambiguous is a question of law."Irene Realty Corp. v. Travelers Property Cas. Co. ofAmerica, 973 A.2d 1118, 1122 (R.I. 2009) (citing Gorman v.Gorman, 883 A.2d 732, 738 n. 8 (R.I. 2005)). "A contract is ambiguous when it is `reasonably susceptible of different constructions.'" Irene Realty Corp,973 A.2d at 1122, n. 2 (quoting Westinghouse Broadcasting Co.,Inc. v. Dial Media, Inc.,122 R.I. 571, 579, 410 A.2d 986, 991 (1980). Furthermore, when a contract is determined to be clear and unambiguous, "the meaning of its terms constitutes a question of law for the court. . . ."Irene Realty Corp, 973 A.2d at 1122 (quoting Cassidy v.Springfield Life Insurance Co.,106 R.I. 615, 619, 262 A.2d 378, 380 (1970)).
In making its determination as to whether or not a contract is ambiguous, the Court should view the contract "in its entirety, giving words their plain, ordinary, and usual meaning."Mallane v. Holyoke Mutual Insurance Company in Salem,658 A.2d 18, 20 (R.I. 1995); see also Andrukiewicz v.Andrukiewicz 860 A.2d 235, 238 (R.I. 2004) ("It is well settled, `[w]hen contract language is clear and unambiguous, words contained therein will be given their usual and ordinary meaning and the parties will be bound by such meaning") (quoting Singer v.Singer, 692 A.2d 691, 692 (R.I. 1997) (mem.)).
[4] The Court observes that even if this agreement had been governed by Rhode Island Law, G.L. 1956 § 6-30-5 provides: "Persons engaged in the business of granting or extending credit by use of credit card may take a request verbally or in writing for any credit card."
[5] The language of the pertinent terms and conditions contained in the original agreement ("Agreement Among Business Platinum Member, Company and American Express Travel Related Services Company, Inc.,") does not substantively differ from the language contained in the amended agreement ("Business Platinum Card Agreement"). Furthermore, the language of both documents is identical with respect to the caption entitled, "Accepting the Agreement."
[6] The Court observes that it is no defense to Mr. Zaman that the written terms were sent to him at the business and not to his personal residence, or that he failed to sign a credit card application. Notwithstanding the language set forth in the terms and conditions, Mr. Zaman's attempted defense that Amex cannot collect the credit balance from him personally in the absence of Mr. Zaman's signature on the application, the Court specifically finds that, under the facts in this case, the provisions of Utah law, Utah Code Am. § 25-5-4, do not require Mr. Zaman's signature on a written credit card application.