Robert W. HAZARD

v.

Connie HAZARD.

No. 2011–116–Appeal.

Supreme Court of Rhode Island.

June 20, 2012.

Robert E. Flaherty, Esq., for Plaintiff.

Sandra A. Lanni, Esq., Warwick, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, ROBINSON, and INDEGLIA, JJ.

**OPINION**

Justice ROBINSON, for the Court.

The parties to this appeal are former spouses, and the issue before us involves the marital settlement agreement (the Agreement) that they entered into in connection with their divorce. The dispute centers around the appraisal of certain real estate of the former husband, Robert W. Hazard, which real estate he acquired before his marriage to Connie Hazard.[1]

On appeal, Robert[2] requests that this Court vacate the Agreement in its entirety due to an alleged error in an appraisal of Robert's property, upon which appraisal Robert alleges that the parties and the Family Court relied to his detriment.

This case came before the Supreme Court for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After reviewing the record and considering the written and oral submissions of the parties, we are satisfied that cause has not been shown and that this appeal may be resolved without further briefing or argument.

For the reasons set forth in this opinion, we affirm the order of the Family Court.

# I
## Facts and Travel

Robert and Connie were married on February 14, 2000, and they remained married for over eight years. On January 12, 2009, Robert filed for divorce, stating that irreconcilable differences had led to the irremediable breakdown of their marriage. Connie filed a counterclaim. Both parties were at all pertinent times represented by counsel.

On January 14, 2010, the parties entered into the Agreement at issue. That very day, after hearing the divorce on the merits, a justice of the Family Court approved that written memorialization of what the parties had agreed to. The Family Court justice found that that Agreement divided their assets—both personal and real—and made an assignment of their debts and liabilities. Based upon the testimony of the parties, the Family Court justice found that the Agreement was entered into freely and voluntarily, that the parties understood its terms and conditions, and that the parties believed the Agreement to be fair and equitable. The Family Court justice proceeded to approve the Agreement, and he then ordered that it be incorporated, but not merged, in any judgment in the case.

The provision of the Agreement that is pertinent to this appeal reads as follows:

"4. *Real Property*. The Husband currently owns two residential properties: rental property located at * * * Bridgetown Road, Narragansett, RI and the marital domicile located at * * * Warburton Avenue, North Kingstown, RI. The parties agree that the increase

---

1. We note that, on the marriage certificate, defendant's first name is listed as "Constance." On all of the pleadings in the record, however, defendant's first name appears as "Connie."

2. Although, in order to make the narrative more readily understandable, we refer to the parties by their first names, we certainly intend no disrespect.

in value during the parties' marriage of * * * Bridgetown Road, Narragansett, RI is $290,000.00. The parties also agree that the increase in value during the parties' marriage of * * * Warburton Avenue, North Kingstown, RI is $95,000.00. The Husband shall pay to Wife, within 60 days of the execution of this Agreement, the sum of $192,500.00 as part of the equitable distribution of marital assets. In exchange therefore, the Wife shall waive any interest she may have in either of the aforementioned properties. Husband shall be solely responsible for any and all expenses, taxes, mortgages, lines of credit, or other costs, expenses, and liabilities associated with said properties and shall in all respects indemnify and hold the Wife harmless thereon."

As will become clear through the testimony of Robert, *infra,* to determine the value of the properties set forth in the just-referenced paragraph of the Agreement, the parties utilized an appraisal performed by Marcia Feeley.

On April 30, 2010, Connie filed a motion to enforce the Agreement.[3] In that motion, Connie alleged that Robert had failed to pay her the sum due to her pursuant to the terms of the Agreement. She therefore requested that the Family Court issue an order directing Robert to forthwith pay $192,500 to her.

Thereafter, on November 10, 2010, a hearing on the motion to enforce was held in the Family Court for Washington County. At that hearing, the court heard testimony from both Connie and Robert—and also from Joseph R. Durette (a licensed certified residential appraiser) and Marcia Feeley (a certified licensed real estate appraiser).

Upon being examined by Connie's counsel at the hearing in November of 2010, Robert acknowledged that, at no time "since the divorce went through" to the date of the hearing, had he paid Connie the $192,500 that is referenced in paragraph 4 of the Agreement. Upon being questioned by his own attorney, Robert stated that (1) he "ha[d] no problem paying the $192,000" and (2) that he had "attempted to" pay his former wife the agreed upon amount. He explained that his attempt consisted of making an application for what he referred to as a loan from a bank;[4] he further explained that the bank appraised the Bridgetown Road property[5] for $250,000. Robert testified

---

**3.** Paragraph 22 of the Agreement reads as follows:

"22. *Default.* In the event that either party shall default in any of the undertakings to be performed by him or her, respectively, under the terms of this Agreement and, after written notice from the other party, the defaulting party does not cure such default within a period of ten (10) days after the posting of such notice by first class mail addressed to the defaulting party at his or her current address, the non-defaulting party may take all steps necessary to enforce the rights conferred upon her or him under the terms of this Agreement and to this end she or he shall have the right to employ counsel at the defaulting party's expense. In the event that it is determined after a hearing or otherwise that the party

charged in fact committed no default, then the party who incorrectly claimed a default shall be fully responsible for all of the other party's attorney's fees and costs connected in any way with the defense of the matter, as determined by the Court."

**4.** The transcript of the Family Court hearing indicates that, at one point, Robert testified that he had applied for a *bank* loan. However, it is clear to us from a reading of his testimony in its entirety that in actuality he applied to a *mortgage company* for a mortgage.

**5.** It will be recalled that paragraph 4 of the Agreement states that "[t]he Husband [*i.e.,* Robert] currently owns two residential properties: rental property located at * * *

that he appealed the appraisal at the $250,000 level, but he said that the bank "came back and stood fast on it [at] $250,000."

Robert further testified that, at the time when the Agreement was being prepared, the Bridgetown Road property had been appraised at $415,000. He testified that the more recent appraisal at the $250,000 level "created a problem with what was presented to [him] at the time [that the] divorce was agreed upon." Robert further testified that he never received a mortgage from Flagship Mortgage, which was the company to which he had applied for a mortgage,[6] because the appraised value of the property (*i.e.*, $250,000) did not meet the "threshold for lending the money" on the property. In response to his counsel's question as to whether he has "been able to secure other mortgage financing," Robert replied that he had not done so because, in his words, "part of the agreement is in dispute."

Joseph R. Durette, "[p]resident appraiser" of Durette Appraisals, Inc., appeared as a witness at the November 10, 2010 hearing, having been called by Robert; he testified that he is a licensed certified residential appraiser. Mr. Durette testified that he had conducted an appraisal of the Bridgetown Road property pursuant to his engagement by a management company (which had hired him on behalf of a mortgage company). At the hearing, Mr. Durette's appraisal (dated March 12, 2010) was entered as a full exhibit. Mr. Durette testified that he employed a sales comparison in order to value the Bridgetown Road property at $250,000. Mr. Durette stated that, in his appraisal, he described the property as a two-family rental property, not as a single-family home.

Mr. Durette further testified that he had reviewed the appraisals conducted on the Bridgetown Road property in June of 2009 by Marcia Feeley of the White Appraisal Company. Mr. Durette testified that, when he reviewed Ms. Feeley's appraisal, he found it to be erroneous due to the fact that her valuation was based on her perception of the property as being "a single family dwelling as opposed to a two family rental property"—which is how he considered it when he made his appraisal. Mr. Durette summarized as follows his view as to the effect of what he considered to be an error in the Feeley appraisal:

> "[O]bviously a single family in Narragansett is worth quite a bit of money and so the value, in my opinion, would have been inflated compared to using it as a two family rental."

Marcia Feeley also appeared as a witness at the hearing, having been called by Connie. She testified that she is a certified licensed real estate appraiser. Ms. Feeley testified that she has been a real estate appraiser for twenty-two years and that she had previously testified as an expert witness in various courts.

Ms. Feeley testified that she appraised the Bridgetown Road property in June of 2009 (*i.e.*, before the Agreement was entered into). She stated that, when she appraised that property, she considered it to be a single-family dwelling with an accessory unit; she said that she based her conclusion on the fact that, in the "methodology of appraisal," the first consideration is the highest and best use of a particular property. Ms. Feeley also testified that she had had an opportunity to review Mr. Durette's appraisal of the same property. She stated that Mr. Durette did not make

---

Bridgetown Road, Narragansett, RI and the marital domicile located at * * * Warburton Avenue, North Kingstown, RI."

**6.** *See* footnote 4, *supra.*

any "locational adjustments" for his "comparables," [7] and she said that the lot sizes of his comparables were substantially smaller than the lot size of the Bridgetown Road property. On cross-examination, Ms. Feeley stated that "[t]he appraisal that [she] did was not a mortgage appraisal" and that, therefore, she employed a form that was different from the one that Mr. Durette had utilized.

The justice of the Family Court who had presided over the hearing on Connie's motion to enforce rendered a bench decision on December 3, 2010. After reviewing the facts, the hearing justice noted that Robert never requested financing on the other property or on "both [of the] properties." The hearing justice further noted that the mortgage company had indeed "questioned Mr. Durette's appraisal amount because * * * there is an appeal;" the court added that the Town of Narragansett had appraised the Bridgetown Road property "at approximately $500,000." The court understood the difference between Mr. Durette's appraisal value and Ms. Feeley's appraisal value to be the difference between a two-family dwelling unit and two free standing units on the same lot.

The hearing justice continued by summarizing the law with respect to mutual mistake. He additionally recognized that there was no affirmative motion before the court to vacate the judgment; he noted that, instead, the court had been presented with only an objection to the motion to enforce. The hearing justice continued by expressly finding that, in this particular case, there had been no mutual mistake. He stated that he found Ms. Feeley's testimony as to her valuation to be "more compelling, more persuasive, convincing

and credible than the Durette evaluation." He elaborated that the "mere fact that Mr. Durette c[ame] in with another valuation does not necessarily mean that there [was] a mutual mistake or that Mr. Durette [was] right." The hearing justice concluded that the fact that Flagship Mortgage would not refinance the Bridgetown Road property based upon Mr. Durette's valuation was not a reason to vacate the Agreement; the hearing justice, therefore, granted Connie's motion to enforce. Accordingly, an order was entered on January 14, 2011, requiring Robert to pay Connie $192,500. Robert timely appealed to this Court.

## II

### Standard of Review

■ In reviewing a ruling of the Family Court, this Court will not disturb findings of fact made by a justice of that tribunal "unless it can be shown that he or she has overlooked or misconceived relevant and material evidence or was otherwise clearly wrong." *Schwab v. Schwab*, 944 A.2d 156, 158 (R.I.2008); *see also Curry v. Curry*, 987 A.2d 233, 237–38 (R.I.2010); *Horton v. Horton*, 891 A.2d 885, 888 (R.I.2006).

## III

### Analysis

■ Robert contends that both parties relied on Ms. Feeley's allegedly erroneous appraisal when entering into the Agreement; he therefore argues that that reliance constituted a mutual mistake. As a result of what he refers to as the "inequitable result of burdening [him] with exorbitant and excessive payments to his

---

7. In the context of real estate, the term "comparables" has been categorized as a plural noun and has been defined as: "Real properties that can be used to fix the value of a specific property by comparison." The American Heritage Dictionary 300 (2d College ed.1985).

spouse and of [Connie] receiving an unconscionable windfall in the form of an equitable distribution greater than the net value of the marital estate," Robert contends that, pursuant to this Court's decision in *Gorman v. Gorman*, 883 A.2d 732 (R.I. 2005), we should vacate or void the agreement in its entirety and require the parties to "start equitable settlement negotiations or to try the case."

■ It is well established that a marital settlement agreement (also referred to as a property settlement agreement) that has been "incorporated by reference, but not merged into the final divorce decree, retain[s] the characteristics of a contract." *See Zaino v. Zaino*, 818 A.2d 630, 637 (R.I.2003); see also *Esposito v. Esposito*, 38 A.3d 1, 5 (R.I.2012); *Paul v. Paul* 986 A.2d 989, 995 (R.I.2010); *Riffenburg v. Riffenburg*, 585 A.2d 627, 630 (R.I.1991). As a result, when interpreting such a contract, we adhere to the basic principle that, "[f]or a contract to be subject to judicial reformation, the court must first find a mutual mistake." *Gorman*, 883 A.2d at 740.

■ We have defined a mutual mistake as being "one that is common to both parties wherein each labors under a misconception respecting the *same terms* of the written agreement * * *." *Merrimack Mutual Fire Insurance Co. v. Dufault*, 958 A.2d 620, 624 (R.I.2008) (internal quotation marks omitted). When, at the time an agreement is entered into, a mutual mistake exists, "the agreement fails in a material respect correctly to reflect the understanding of both parties." *Id.* (internal quotation marks omitted). It is also a basic principle that "[a] mutual mistake is not merely the existence of a common error, but rather involves a shared misconception relating to the parties' intent." *Id.* *See generally* 17A Am.Jur.2d *Contracts* § 202 at 209 (2004) ("Mutual mistake results when both parties to a contract share a common assumption about a vital existing fact upon which they based their bargain and that assumption is false, and because of the mistake, a quite different exchange of values occurs from the exchange of the values the parties contemplated."). In addition, a party must prove the existence of a mutual mistake by clear and convincing evidence before a court may reform, vacate, or dismiss a contractual agreement. *McEntee v. Davis*, 861 A.2d 459, 463 (R.I.2004).

With respect to the instant case, it is undisputed that the parties relied on Ms. Feeley's appraisal of the Bridgetown Road property when they entered into the Agreement. At the hearing on the motion to enforce, Ms. Feeley testified that she is a certified licensed real estate appraiser in Rhode Island, and she testified as to her significant experience as a real estate appraiser. Ms. Feeley further stated that she had arrived at a valuation of the Bridgetown Road property that differed from that of Mr. Durette because she had viewed the property as consisting of a single-family dwelling with a rental unit, rather than as a two-unit rental property (as Mr. Durette had done).

The hearing justice found the valuation performed by Ms. Feeley to be "more compelling, more persuasive, convincing and credible than the Durette evaluation," and he observed that the mere fact that Mr. Durette's appraised value as to the Bridgetown Road property differed from Ms. Feeley's did not mean that his valuation was correct.

We note that the two parties *both* relied on Ms. Feeley's appraisal "at the time [the Agreement was] entered into * * *." *See Dufault*, 958 A.2d at 624. Neither party chose to have a second appraisal performed at that time—as either or both of them were entitled to do. Accordingly, the parties entered into the unambiguous

Agreement based on Ms. Feeley's appraisal, which the Family Court found to be more convincing and credible than the Durette valuation. The Agreement does not fail in any material respect to correctly reflect the understanding of both parties as to the valuation of the Bridgetown Road property at the time when they entered into the Agreement.[8] The hearing justice declined to find that, simply because Mr. Durette's appraisal of the Bridgetown Road property differed from Ms. Feeley's, hers was therefore erroneous. After carefully reviewing the record, we agree with the hearing justice that a mutual mistake of material fact was not established in this case by clear and convincing evidence; therefore, Robert has not met his burden of proof. *See Esposito,* 38 A.3d at 6.[9] And, since Robert has not successfully borne the burden of proving by clear and convincing evidence that there was a mutual mistake of fact regarding the value of the Bridgetown Road property when the Agreement was entered into, the Family Court was not free to reform, vacate, or dismiss it. *See Gorman,* 883 A.2d at 740–41; *McEntee,* 861 A.2d at 463.

Accordingly, the Family Court did not err in granting Connie's motion to enforce.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the order of the Family Court.

The record in this case may be returned to that tribunal.

Justice FLAHERTY did not participate.

8. The instant case differs radically from the classic mutual mistake scenario. *See Sherwood v. Walker,* 66 Mich. 568, 33 N.W. 919 (1887) (the famous "barren cow" case). In that case, both parties believed the cow at issue to be barren—and both were mistaken. In stark contrast to that case, Robert did not succeed in establishing that the appraisal relied on (*viz.,* Ms. Feeley's) constituted a mistake—let alone a mutual mistake. Unquestionably, there was an after-the-fact dispute as to the correct valuation, but it is clear that, unlike the situation in *Sherwood,* the parties

to the instant case were not victims of an indubitable and jointly shared mistake at the time that they assented to the Agreement.

9. In our approach to this case, we have been mindful of the fact that there have been no allegations of fraud or inequitable conduct. *See Gorman v. Gorman,* 883 A.2d 732, 741 (R.I.2005) ("Other circumstances, such as fraud, can sometimes provide a basis for judicial reformation; but none of those circumstances are present in this case.").